UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MAHIB DIENG,<br><br>         Plaintiff,<br>   v.<br><br>LAURA HERMOSILLO et al.,<br><br>         Defendants. | CASE NO. 2:26-cv-00190-LK<br><br>ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS |

This matter comes before the Court on Petitioner Mahib Dieng's Petition for Writ of Habeas Corpus. Dkt. No. 1. For the reasons described below, the Court grants in part and denies in part the petition.[1]

## I.    BACKGROUND

Dieng is a citizen of Senegal who entered the United States "on or around March 15, 2022, to seek asylum." Dkt. No. 1 at 3, 5; *see also* Dkt. No. 11 at 1. He was arrested and detained at the border. Dkt. No. 1-2 at 3. "Upon apprehension, Mr. Dieng immediately expressed fear of returning

---

[1] The Court declines to hold an evidentiary hearing because the record is sufficient for adjudication of the petition. *See Owino v. Napolitano*, 575 F.3d 952, 954 (9th Cir. 2009) (holding that "the district court must hold an evidentiary hearing" where "the record is insufficient to decide whether [the petitioner's] detention is authorized by statute").

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS - 1

to Senegal"; however, he was "not given a credible fear interview during his initial detention." Dkt. No. 1 at 5; *see also* Dkt. No. 11 at 2. On March 17, 2022, expedited removal proceedings under 8 U.S.C. § 1225(b)(1) were initiated against him. Dkt. No. 1-2 at 2–3; Dkt. No. 12-3 at 3.

On March 22, 2022, Dieng applied for asylum. Dkt. No. 12-3 at 3. On March 30, 2022, Dieng was granted humanitarian parole under Section § 212(d)(5) of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1182(d)(5)). Dkt. No. 11 at 2; Dkt. No. 12-3 at 3. Because Dieng was released from detention, his credible fear interview, scheduled for April 27, 2022, was cancelled. Dkt. No. 11 at 2. In addition, on March 31, 2022, United States Citizenship and Immigration Services ("USCIS") administratively closed his asylum case, "citing review." Dkt. No. 12-3 at 3.

Dieng "relocated to the Seattle, Washington area" and "was subsequently granted employment authorization so that he could support himself while waiting for an interview[.]" Dkt. No. 1 at 5; *see also* Dkt. No. 5 at 2. "No credible fear interview was ever scheduled." Dkt. No. 1 at 5.[2] It appears that on February 28, 2023, Dieng applied for asylum again. Dkt. No. 1 at 5; Dkt No. 11 at 2.[3] USCIS administratively closed that application on or about July 15, 2025, "because Petitioner was still in Expedited Removal proceedings." Dkt. No. 11 at 2. The Notice of Dismissal informed Mr. Dieng that he would receive an appointment notice for a credible fear interview at a later time and date. Dkt. No. 12-2 at 2.

---

[2] On January 30, 2026—after Dieng filed this petition—"USCIS . . . called [Dieng's]'s counsel . . . for an unscheduled Credible Fear Interview (CFI) with Mr. Dieng." Dkt. No. 7 at 3. Counsel requested that the interview be rescheduled, but the officer suggested that a rescheduled interview could occur as soon as the next day—Saturday, January 31, 2026. *Id.* Dieng then sought emergency relief enjoining Respondents from conducting a credible fear interview or dismissing his asylum application. *Id.* at 8. Hours later, he withdrew the pending motion for a temporary restraining order, stating that Respondents agreed "to defer any efforts to schedule or conduct a Credible Fear Interview for at least two weeks or until a final judgment has been entered in the habeas corpus action, whichever is later," and that he agreed that the time during which the credible fear interview is deferred "will not count against USCIS in regard to their deadlines to conduct the CFI." Dkt. No. 9 at 1–2.

[3] Both sides assert that Dieng filed an asylum application in February 2023, Dkt. No. 1 at 5; Dkt No. 11 at 2, but the A-file in the record does not reflect this, Dkt. No. 12-3.

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS - 2

On November 6, 2025, Dieng again applied for asylum. Dkt. No. 11 at 2; Dkt. No. 1-3. On January 16, 2026, while his most recent asylum application remained pending, Dieng reported to the Seattle ICE Enforcement and Removal Operations ("ERO") Field Office in Seattle for a scheduled check-in, and "he was arrested and detained by ICE." Dkt. No. 1 at 6; Dkt. No. 12-3 at 3. He was not given "written notice of the reason for his re-detention" or a "hearing before a neutral decisionmaker to determine if his re-detention is justified." Dkt. No. 1 at 6.

Dieng filed the present petition two days later on January 18, 2026. Dkt. No. 1. On January 29, 2026, USCIS administratively closed Dieng's November 2025 asylum application because he "was still in Expedited Removal proceedings." Dkt. No. 11 at 2.

Dieng's petition alleges that (1) his Fifth Amendment Procedural Due Process rights were violated when Respondents re-detained him without providing written notice explaining the basis for revocation of his release and without providing him a detention hearing before a neutral decisionmaker, and (2) his continued detention violates the INA and its implementing regulations because he did not receive an individualized determination that he constituted a flight risk or danger to the community. Dkt. No. 1 at 2–3, 11–12. He seeks an order (1) granting him release, (2) "permanently enjoining his re-detention absent written notice and a hearing prior to re-detention where Respondents must prove by clear and convincing evidence that he is a flight risk or danger to the community and that no alternative to detention would mitigate those risks," (3) declaring that his detention "without an individualized determination before a neutral decisionmaker violates the Due Process Clause of the Fifth Amendment," and (4) awarding him attorney's fees and costs. *Id.* at 12. On February 2, 2026, Respondents[4] filed their return in

---

[4] Although Bruce Scott, the warden of the NWIPC, has not appeared in this case, (1) the purpose of naming the petitioner's custodian is to effectuate injunctive relief where appropriate, *see Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (the custodian has "the power to produce the body of [the petitioner] before the court or judge," such that "he may be liberated if no sufficient reason is shown to the contrary" (citation modified)); and (2) federal respondents often represent the warden's interests, as they do in this case, *see Doe v. Garland*, 109 F.4th 1188, 1196 (9th Cir.

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS - 3

opposition to the petition, Dkt No. 10, and Dieng filed a traverse on February 9, 2026, Dkt. No. 13.

## II.    DISCUSSION

### A.    Legal Standard

The Constitution guarantees the availability of the writ of habeas corpus "to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art I, § 9, cl. 2). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). A writ of habeas corpus may be granted to a petitioner who demonstrates that he is in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). Historically, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). Accordingly, a district court's habeas jurisdiction includes challenges to immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

Under the Due Process Clause of the Fifth Amendment to the United States Constitution, no person shall be "deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. "The Fifth Amendment guarantees due process in deportation proceedings." *Torres-Aguilar v. I.N.S.*, 246 F.3d 1267, 1270 (9th Cir. 2001). "[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693; *see also Demore v. Kim*, 538 U.S. 510, 523 (2003) (recognizing that Fifth Amendment due process protections extend to deportation

_____

2024) ("Even in cases where private contract wardens are named as respondents, the government can and has stepped in to defend its interest in keeping petitioners detained.").

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS - 4

proceedings, but noting that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process").

The federal courts have "long recognized the existence of an implied cause of action through which plaintiffs may seek equitable relief to remedy a constitutional violation." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020). A plaintiff seeking a permanent injunction must demonstrate (1) that she has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "Once a [constitutional] right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Roman*, 977 F.3d at 942 (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)).

**B.      Dieng has Established a Due Process Violation**

1.   Applicability of the Due Process Clause

The Supreme Court has noted important distinctions "between those [noncitizens] who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality." *Leng May Ma v. Barber,* 357 U.S. 185, 187 (1958). "In the latter instance, the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" *Id.* "[O]nce [a noncitizen] enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

The "entry fiction" extends this distinction "to some individuals within the United States but who, as a result of their status, are deemed technically to be outside." *Xi v. I.N.S.*, 298 F.3d 832, 837 (9th Cir. 2002). For example, "[w]hen [a noncitizen] arrives at a port of entry—[such as] an international airport—the [noncitizen] is on U. S. soil, but the [noncitizen] is not considered to have entered the country for the purposes of this rule." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020). In other words, "[noncitizens] who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). The Supreme Court has held this to mean that a noncitizen in such circumstances is limited to "only those rights *regarding admission* that Congress has provided by statute." *Id.* at 140 (emphasis added).

"But the Supreme Court has never applied the entry fiction doctrine to a case like this—to constitutionally justify the *detention* of a person living freely, for years, within the United States— and its expansion here cannot be justified." *Rincon v. Hyde*, No. CV 25-12633-BEM, 2025 WL 3122784, at *2 (D. Mass. Nov. 7, 2025) (emphasis added); *see also Padilla v. ICE*, 704 F. Supp. 3d 1163, 1170–72 (W.D. Wash. 2023) (addressing the distinction between a challenge to admission and a challenge to detention and holding that *Thuraissigiam* does not foreclose a challenge to detention); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 147, 151 (W.D.N.Y. 2025) ("While *Thuraissigiam* forecloses the argument that [petitioner] has due process rights beyond those provided by statute concerning the process for deciding whether or not he will be *admitted* to this country, it does not foreclose his arguments regarding parole revocation and release."). As the court observed in *Rincon*,

"The proper use of legal fiction is to prevent injustice." *Union Refrigerator Transit Co. v. Commonwealth of Kentucky*, 199 U.S. 194, 208 (1905) ("*[I]n fictione juris semper aequitas existit.*" (quoting 3 William Blackstone, *Commentaries* *43) ["Within a legal fiction, equity always resides."]). Pretending that Petitioner never entered the United States not only subordinates fact to fiction, it disregards the plain meaning of the Due Process Clause, which promises its protection to every "person" within the United States. U.S. Const. amend. V.

To be sure, this has always been, to some degree, the effect of the entry fiction doctrine. *See, e.g.*, *Thuraissigiam*, 591 U.S. [at] 138–40 (holding that a non-citizen could not challenge on constitutional due-process grounds the procedure that determined his admission to the United States, even though he was detained twenty-five yards *past* the southern border). But those cases reflect a pragmatic and functional balance between two legal absolutes *not* in tension here—the Constitution's foundational prohibition against "arbitrary governmental action," *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992), and "the 'sovereign prerogative' of governing admission to this country," *Thuraissigiam*, 591 U.S. at 140 (quoting [*Landon v.*] *Plasencia*, 459 U.S. [21,] 32 [(1982)]. . . .

While detention pending removal proceedings certainly constitutes an "aspect of the deportation process," *Demore v. Kim*, 538 U.S. 510, 523 (2003), it only collaterally implicates Congress's "sovereign prerogative . . . to decide which [noncitizens] to *admit*," *Thuraissigiam*, 591 U.S. at 139 (emphasis added) (quoting *Plasencia*, 459 U.S. at 32).

This matters because that "sovereign prerogative," *id.*, is the basis of the judge-made rule that undergirds *Thuraissigiam* and similar cases—the so-called entry fiction doctrine, whereby a non-citizen physically present in the United States is treated "as if stopped at the border" for purposes of due process, *id.* (quoting [*Shaughnessy v. United States ex rel.*] *Mezei*, 345 U.S. [206,] 215 [(1953)].

2025 WL 3122784, at *2, 5 (parallel citations omitted). Thus, while "[g]ranting the relief requested in *Mezei* or *Thuraissigiam*—initial entrance to the United States (*Mezei*) or a more robust process toward admission (*Thuraissigiam*)—might have genuinely 'undermine[d] the sovereign prerogative of governing admission to this country,'" the same "cannot be said" with respect to a petitioner "who merely seeks to continue engaging in the same removal proceedings as before, only not from a jail cell." *Id.* at 7 (finding that, because "the fiction required to deprive Petitioner of his constitutional protections is severely disproportionate" and "nowhere in line with the reasonable workings of those prior cases," to apply the entry fiction doctrine to a case like Petitioner's "is to set aside the plain meaning of the Fifth Amendment altogether"); *see also*

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS - 7

*Malunda David Gilberto Destino v. FCI Berlin, Warden, et al.*, No. 1:25-CV-374-SE-AJ, 2025 WL 4010424, at *7 (D.N.H. Dec. 24, 2025) ("In non-admission contexts, which do not directly implicate the executive's sovereign prerogative, the Due Process Clause protects liberty interests that may accrue regardless of statutory allowances.").

Here, where Dieng has "lived with relative freedom in the United States for . . . years," the constitution does not countenance fictional erasure of his actual presence in this country—or his concomitant due process rights. *Rincon*, 2025 WL 3122784, at *6–7. As explained by the Supreme Court in *Morrissey v. Brewer*, parole "enables [the parolee] to do a wide range of things open to persons" who have never been in custody or convicted of any crime, including to live at home, work, and "be with family and friends and to form the other enduring attachments of normal life." 408 U.S. 471, 482 (1972). "Though the [government] properly subjects [the parolee] to many restrictions not applicable to other citizens," such as monitoring and seeking authorization to work and travel, the parolee's "condition is very different from that of confinement in a prison." *Id.* Because "[t]he parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions," the revocation of parole undoubtedly "inflicts a grievous loss on the parolee," and the parolee possesses a protected interest in his "continued liberty." *Id.* at 481–84 (citation modified).

This Court reiterates that humanitarian parole can establish the same kinds of liberty interests described in *Morrissey*. *Flores Torres v. Hermosillo*, No. 2:25-CV-02687-LK, 2026 WL 145715, at *5 (W.D. Wash. Jan. 20, 2026) (collecting cases). And "the applicable statutory process shapes [the petitioner's] procedural due-process rights." *Doe v. Andrews*, No. 1:25-CV-00333-JLT-HBK (HC), 2025 WL 3280777, at *7 (E.D. Cal. Nov. 25, 2025) (quoting *Gonzalez Aguilar v. Wolf*, 448 F. Supp. 3d 1202, 1212 (D.N.M. 2020)). The Court therefore addresses the statutory process required here.

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS - 8

2.  Statutory Violation

Dieng has demonstrated that the government failed to follow federal law in detaining him. Section 1182 provides that parole may be granted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]" 8 U.S.C. § 1182(d)(5)(A). The implementing regulations include another requirement for parole: the noncitizen must "present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b). In other words, if a noncitizen has been granted parole, it means that a DHS official with authority decided that there were either "urgent humanitarian reasons" or "significant public benefit" justifying the parole of that individual, and that the individual did not pose a security or flight risk.

Parole automatically terminates if the noncitizen departs from the United States or "at the expiration of the time for which parole was authorized," and "no written notice shall be required" for automatic termination. 8 C.F.R. § 212.5(e)(1). Otherwise, for parole to be terminated, (1) "the purpose for which parole was authorized" must have been accomplished or a DHS official with authority must decide that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States"; and (2) written notice must be provided to the noncitizen. 8 C.F.R. § 212.5(e)(2)(i); *see also* 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the [noncitizen] shall forthwith return or be returned to the custody from which he was paroled[.]").

Once a noncitizen's parole has terminated—either automatically or on notice—"any order of exclusion, deportation, or removal previously entered shall be executed." 8 C.F.R. § 212.5(e)(2)(i); *see also* 8 C.F.R. § 212.5(e)(1) ("[T]he [noncitizen] shall be processed in accordance with paragraph (e)(2) of this section except that no written notice shall be required."). "If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the [noncitizen] shall again be released on parole unless in the opinion of [a DHS official with

authority] the public interest requires that the [noncitizen] be continued in custody." 8 C.F.R. § 212.5(e)(2)(i).

Respondents aver that Dieng's initial grant of parole expired on March 30, 2023, Dkt. No. 10 at 6, because his "Interim Notice Authorizing Parole"—issued on March 30, 2022—provided that his parole authorization was "valid for one year beginning from the date on this notice and will automatically terminate . . . at the end of the one-year period unless ICE provides you with an extension at its discretion," Dkt. No. 12-1 at 2. The Notice also states, "You have been released from service custody pending a final decision in your exclusion/deportation hearing." *Id.* at 3. Respondents note that "[n]o documentation could be located extending the parole, so it is unclear if Petitioner's parole has expired." Dkt. No. 10 at 6.[5]

Regardless of whether Dieng's parole terminated automatically on March 30, 2023 or if it was extended by ICE, Dieng has demonstrated that the government failed to follow federal law in detaining him. If Dieng's parole terminated automatically, Respondents were required to execute any order of exclusion, deportation, or removal "within a reasonable time"; if that could not be done, they were required to release him on parole again "unless in the opinion of [a DHS official with authority,] the public interest requires that the [noncitizen] be continued in custody." 8 C.F.R. § 212.5(e)(2)(i); *see also id.* ("[T]he [noncitizen] *shall* again be released on parole[.] (emphasis added)). Dieng's parole expired nearly three years ago, and no order of exclusion, deportation, or removal has been executed in that time. Under the circumstances in this case—where Dieng continued to live in the same community and check in regularly with ICE as required—the Court finds that Respondents have not effectuated any such order within a reasonable time. Furthermore,

---

[5] A note in Dieng's A-file states that he has a "final order of removal[.]" Dkt. No. 12-3 at 3. That statement is not supported by the record, especially given Respondents' argument that Dieng is "subject to mandatory detention pursuant to 8 U.S.C. § 1225(b)." Dkt. No. 10 at 3; *see Avilez v. Garland*, 69 F.4th 525, 530 (9th Cir. 2023) ("Section 1231(a) applies to detention after the entry of a final order of removal.").

Respondents have put forth no evidence that "in the opinion of [a DHS official with authority,] the public interest requires that [Dieng] be continued in custody." Therefore, 8 C.F.R. § 212.5(e)(2)(i) requires Dieng's return to parole, and his detention violates ICE's own regulations. *See O.F.B. v. Maldonado*, No. 25-CV-6336 (HG), 2025 WL 3277677, at *6 (E.D.N.Y. Nov. 25, 2025) ("Under these circumstances, the applicable regulatory provision requires that Petitioner 'shall again be released on parole' unless ICE has made an individualized determination that 'the public interest requires that the alien be continued in custody.' . . . Here, because no such determination has been made, Petitioner is being detained in violation of the agency's own regulations.").

If ICE instead extended Dieng's parole,[6] then it could only be terminated "on notice" pursuant to 8 C.F.R. § 212.5(e)(2),[7] which requires that (1) "the purpose for which parole was authorized" must have been accomplished or a DHS official with authority must decide that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States"; and (2) written notice must be provided to the noncitizen. 8 C.F.R. § 212.5(e)(2)(i). Respondents have offered no evidence that they provided Dieng with the written notice required by 8 C.F.R. § 212.5(e)(2)(i), even to this date. Nor have they put forth any evidence that "the purpose for which parole was authorized" has been accomplished or that a relevant official opined that "neither humanitarian reasons nor public benefit warrants the continued presence" of Dieng in the United States. *See generally* Dkt. Nos. 10–12. To the contrary,

---

[6] The record suggests this may be the case. As Respondents acknowledge, "[t]he sole means of release from detention pursuant to Section 1225(b) is temporary parole 'for urgent humanitarian reasons or significant public benefit[.]'" Dkt. No. 10 at 5 (citing *Jennings v. Rodriguez*, 583 U.S. 281, 283 (2018)). As of December 2025, Dieng was "liv[ing] [and] work[ing] . . . in the Seattle, Washington area"; he had "obtained work authorization [and] complied with the check-in requirements of his parole[.]" Dkt. No. 1 at 2. And he was arrested at a "scheduled reporting" appointment with ICE. Dkt. No. 12-3 at 3. Given those facts, and because "[t]he sole means of release from detention pursuant to Section 1225(b) is temporary parole 'for urgent humanitarian reasons or significant public benefit,'" Dkt. No. 10 at 5, Respondents appear to have extended Dieng's parole, Dkt. No. 12-3 at 3.

[7] It could also be terminated if Dieng had left the United States, 8 C.F.R. § 212.5(e)(1), but neither party suggests he has done so.

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS - 11

Respondents only aver that Dieng was taken into custody because "ERO made the decision to revoke [his] parole and return him to custody to finish his Expedited Removal proceedings." Dkt. No. 11 at 3. It appears that ERO's decision was made on the same day of Dieng's arrest: when Dieng reported to ICE "for scheduled reporting" on January 16, 2026, ERO officers conducted "routine system queries" and noticed that Dieng's asylum application had been administratively closed. Dkt. No. 12-3 at 3.[8] "ERO Seattle management [then] issued a Warrant of Arrest of [Noncitizen], Form I-200." *Id.* Nothing in Respondents' submission indicates that the purpose for which parole was authorized has been accomplished or that a relevant official made the requisite findings for termination.

Based on the above analysis, the Court concludes that Respondents violated Dieng's statutory rights in detaining him, whether his parole has terminated or not. *See Gabriel v. Bondi*, No. 25-CV-4298 (KMM/EMB), 2025 WL 3443584, at *6 (D. Minn. Dec. 1, 2025) ("Without any suggestion that such a determination [as that required under the statute and regulation] occurred, Respondents could not have complied with § 1182(d)(5)(A) and Part 212.5(e)(2)(i) in revoking Petitioner's parole," and accordingly, "the revocation, and[] . . . Petitioner's detention[] is unlawful.").[9]

---

[8] DHS records from that same day indicate that "Dieng has a pending fear claim" so ERO planned to "re-refer his case for a Credible Fear Interview." *Id.*

[9] *See also Delfin-Ricardo v. Noem*, No. 26-CV-136-RSH-BJW, 2026 WL 353357, at *2 (S.D. Cal. Feb. 9, 2026) ("Courts have determined, in cases where DHS fails to follow its own regulations in revoking humanitarian parole, that the resulting detention is unlawful and the petitioner's release should be ordered."); *Savane v. Francis*, 801 F. Supp. 3d 483, 491–92 (S.D.N.Y. 2025) ("Respondents' revocation of . . . parole under § 1182(d)(5)(A) without any process violated Petitioner's due process rights . . . because [Respondents] did not comply with the statutorily required process for revoking that parole."); *Orellana v. Francis*, No. 25-CV-04212 (OEM), 2025 WL 2402780, at *7 (E.D.N.Y. Aug. 19, 2025) (reasoning that "by failing to lawfully revoke [Petitioner's] parole, Respondents lacked the authority to arrest Petitioner"), *reconsideration denied in relevant part*, No. 25-CV-04212 (OEM), 2025 WL 2822640, at *4 (E.D.N.Y. Oct. 3, 2025) (finding again that "by failing to lawfully revoke [Petitioner's] parole, Respondents lacked the authority to arrest Petitioner" and reasoning "[a]s such, the revocation of Petitioner's parole was unlawful and his resulting detention invalid"); *Zavorin v. Wamsley*, No. 2:26-CV-00173-DGE, 2026 WL 309733, at *4 (W.D. Wash. Feb. 5, 2026) (granting habeas petition when Respondents revoked Petitioner's humanitarian parole without following the procedural requirements set forth in 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5(e)(2)(i)).

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS - 12

3. Due Process Violation

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews*, 424 U.S. at 332. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong*, 380 U.S. at 552). Courts analyze three factors to determine whether an administrative procedure provides due process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. In *Rodriguez Diaz v. Garland*, the Ninth Circuit assumed without deciding that *Mathews'* three-part test applies in "the immigration detention context," 53 F.4th 1189, 1206–07 (9th Cir. 2022), and district courts have applied the *Mathews* test in that context, *see, e.g.*, *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1033 (N.D. Cal. 2025).

With respect to the first factor, it is undisputed that Dieng has a liberty interest in being free from imprisonment. *Zadvydas*, 533 U.S. at 690. His liberty interest "is valuable and must be seen as within the protection of the [Due Process clause]" such that "its termination calls for some orderly process," *Morrissey*, 408 U.S. at 482, as provided under 8 C.F.R. § 212.5(e)(2). A "petitioner's liberty interest [does] not expire along with his parole." *Quiroga-Chaparro v. Warden of the Golden State Annex Det. Facility*, No. 1:25-CV-1731 AC, 2025 WL 3771473, at *4 (E.D. Cal. Dec. 31, 2025) (citation modified). This factor weighs in Dieng's favor.

Turning to the second factor, for the reasons stated in this Court's order in *Flores Torres*, due process at least requires that (1) the government justify the basis for re-detention, as prescribed

by the statute and its implementing regulations, and (2) Dieng be given "the opportunity to be heard" with respect to the government's basis for re-detention under the applicable statutory and regulatory framework "at a meaningful time and in a meaningful manner." 2026 WL 145715, at *7 (citation modified). Here, as discussed above, the government did not follow the procedures required by its own regulations—whether or not Dieng's parole was terminated. The risk of erroneous deprivation is significant where the government fails to follow its own procedures, thus depriving the noncitizen of process due prior to being detained.[10] "[T]he additional procedural safeguards identified in 8 C.F.R. § 212.5 are not only valuable for preventing the erroneous deprivation of an important interest, they are required by the Section 1225 statutory scheme[.]" *O.F.B.*, 2025 WL 3277677, at *7; *see also de la Rosa Espinoza v. Guadian*, No. 20-3126-JWL, 2020 WL 3452967, at *8 (D. Kan. June 24, 2020) ("[T]he applicable statutory process shapes Petitioner's procedural due-process rights[.]"). This factor favors Dieng.

With respect to the last factor, "the government's interest in efficient administration of the immigration laws at the border is not impermissibly burdened by affording the process laid out in 8 C.F.R. § 212.5 because it is required to follow its own regulations." *O.F.B.*, 2025 WL 3277677, at *7 (citation modified). Therefore, this factor too weighs in favor of Dieng.

---

[10] *See Lopez v. Noem*, No. CV-GLR-25-3662, 2025 WL 3496195, at *5 (D. Md. Dec. 5, 2025) (finding that there was a high risk of erroneous deprivation because "the Government's failure to comply with its own agency regulations necessarily deprive[d] [petitioner] of the procedural process due her, rendering her current detention unlawful"); *J.L.R.P. v. Wofford*, No. 1:25-CV-01464-KES-SKO (HC), 2025 WL 3190589, at *9 (E.D. Cal. Nov. 14, 2025) (finding that the risk of erroneous deprivation was high where "ICE revoked petitioner's release on the grounds that his removal was reasonably foreseeable, but it did not provide petitioner the process required by its own regulations, it forced petitioner to file a habeas petition to obtain relief, and [it] has failed to identify any evidence that petitioner's removal was actually reasonably foreseeable at any point"); *Salazar v. Casey*, No. 25-CV-2784 JLS (VET), 2025 WL 3063629, at *4 (S.D. Cal. Nov. 3, 2025) ("[T]he risk of an erroneous deprivation of [petitioner's] interest [in remaining out of custody pursuant to her humanitarian parole] is high as Petitioner's parole was revoked without providing her a reason for revocation or giving her an opportunity to be heard"); *Munoz Materano v. Arteta*, No. 25-CV-6137-ER, 2025 WL 2630826, at *14 (S.D.N.Y. Sept. 12, 2025) (finding a risk of erroneous deprivation where "Respondents provide[d] no indication that an individualized determination was made as to the revocation of [Petitioner's] parole; nor d[id] they articulate, even now, either that the purpose for which [Petitioner's] parole was authorized has been accomplished, []or that neither humanitarian reasons nor public benefit warrants his continued presence in the United States.").

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS - 14

Under *Matthews*, the Court finds that Respondents failed to provide Dieng with the procedures due to him under the Due Process Clause, and accordingly, his detention is unlawful.

**C.     The Court Denies Dieng's Request for Permanent Injunctive Relief**

Dieng requests an order "permanently enjoining his re-detention absent written notice and a hearing prior to re-detention where Respondents must prove by clear and convincing evidence that h[e] is a flight risk or danger to the community and that no alternative to detention would mitigate those risks[.]" Dkt. No. 1 at 12.

Where habeas petitioners raise Due Process claims and have also invoked the Court's jurisdiction under 28 U.S.C. § 1331, the Court has "the authority both to entertain [the petitioner's] constitutional challenges and to grant injunctive relief in response to them," "irrespective of the accompanying habeas petition." *Roman*, 977 F.3d at 941–42. Importantly, though, "[i]n seeking a permanent injunction, the moving party must convince the court that relief is needed: 'The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'" *Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953)).

Nowhere in Dieng's petition does he allege that his re-detention is likely, or that such detention will not comport with the statutory and regulatory framework discussed above. *See generally* Dkt. No. 1.[11] Without argument or evidence that his unlawful re-detention is likely to

---

[11] The Court does not entertain his new arguments regarding this issue in Dieng's very lengthy reply brief, *see* Dkt. No. 13 at 18–19; "[i]t is well-settled . . . that a habeas petitioner cannot amend his petition – much less introduce wholly new claims – in his reply brief." *McClellon v. Rickard*, No. 24-CV-10053 (VSB) (BCM), 2025 WL 3286917, at *10 (S.D.N.Y. June 24, 2025); *see also Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief. In order for the State to be properly advised of additional claims, they should be presented in an amended petition or . . . in a statement of additional grounds."); *Calderon v. Noem*, No. 2:25-CV-2136-LK-TLF, 2025 WL 3754042, at *4 (W.D. Wash. Dec. 29, 2025).

occur, Dieng's request constitutes nothing more than a "mere possibility" that does not entitle him to relief. *Id.* (citation modified); *see also Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("Our adversarial system relies on the advocates to inform the discussion and raise the issues to the court."). For this reason, his request for the injunctive relief described above is denied.[12]

## III.     CONCLUSION

For the reasons stated above, the petition for the writ of habeas corpus, Dkt. No. 1, is GRANTED IN PART AND DENIED IN PART, and the Court ORDERS as follows:

1.      Respondents shall immediately release Dieng from custody subject to the conditions of his most recent parole agreement;

2.      The parties shall file a Joint Status Report by February 16, 2026, confirming that Dieng has been released;

3.      Any fee petition should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412. *See Daley v. Ceja*, 158 F.4th 1152, 1162 (10th Cir. 2025) (the Equal Access to Justice Act authorizes the award of attorney's fees to petitioners who prevail against the government in immigration habeas actions); *Michelin v. Warden Moshannon Valley Corr. Ctr.*, No. 24-2990, 2026 WL 263483, at *13 (3d Cir. Feb. 2, 2026) ("The EAJA authorizes an award of attorneys' fees and costs to the prevailing party 'in any civil action (other than cases sounding in tort)' brought by or against the United States if the Government's position was not

---

[12] Dieng argues for the first time in his reply brief that Dieng is not an "arriving alien" subject to expedited removal and that "the Court should hold that Mr. Dieng cannot be subject to 8 U.S.C. § 1225, even if Respondents hold a pre-deprivation hearing in the future." Dkt. No. 13 at 3, 12–15, 17. For the reasons stated in the prior footnote, the Court does not entertain these sweeping and improper new arguments. *See also Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *23 (D.C. Cir. Nov. 22, 2025) ("Parolees enter on the condition and with the understanding that they remain legally at the border.").

ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS - 16

'substantially justified.' . . . [T]his provision clearly covers petitions for writs of habeas corpus from immigration detention[.]"); *Petition of Hill*, 775 F.2d 1037, 1041 (9th Cir. 1985) (reasoning that an award of fees under EAJA was not necessarily foreclosed for a habeas petition brought by "a nonresident [noncitizen]" in the immigration context). The Court emphasizes that time spent on work that is "excessive, redundant, or otherwise unnecessary" is not compensable. *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992) (citation modified). For example, attorneys may not seek compensation for time spent developing a habeas petition template when such template was merely re-used in the instant proceeding; only the time spent dedicated to this proceeding is compensable. *See Eve Nevada, LLC v. Derbyshire*, No. 21-0251-LK, 2022 WL 279030, at *10 (W.D. Wash. Jan. 31, 2022); *see also* Dkt. No. 1 at 2, 4 (referring to the petitioner as "Mr. Demakpor"); Dkt. No. 13 at 10, 11 (referring to the petitioner as "Mr. Lopez"). The Court will carefully scrutinize any fee application it receives from Dieng's counsel.

Dated this 13th day of February, 2026.

Lauren King
United States District Judge